GISKAN SOLOTAROFF & ANDERSON LLP
1 Rockefeller Plaza, 8th Floor
New York, New York 10020
(646) 964-9609
Jason L. Solotaroff
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------x
SANJAY REDDY, Ph.D,

Plaintiff, Dkt. No.

-against- **COMPLAINT**

THE NEW SCHOOL,

Defendant.
---------------------------------------------------x

Plaintiff Sanjay Reddy, Ph.D, by and through his attorneys, Giskan Solotaroff & Anderson LLP, allege the following against Defendant The New School.

## NATURE OF THE ACTION

1. This is an action, against The New School, an educational institution located in New York, New York, for race discrimination and retaliation in violation of 42 U.S.C. 1981, breach of contract, promissory estoppel, and age discrimination in violation of the New York State and City Human Rights Laws.

2. Dr. Reddy, an Asian Indian man, is an esteemed full professor of economics at The New School who received tenure upon his appointment in 2009. On June 1, 2026, The New School informed Dr. Reddy and several other tenured professors that their employment would be terminated, effective December 31, 2026. The New School's stated justification for the

termination of Dr. Reddy and the other professors was that it was necessary due to the university's financial situation.

3. Dr. Reddy was targeted for termination for several reasons.

4. One, Dr. Reddy was one of several non-white professors in the economics department who had been targeted by a white member of the department who has a close relationship with The New School's administration. Dr. Reddy also complained about racist behavior, including a complaint of racism to a New School dean made shortly before the termination decision.

5. Two, as a tenured professor, pursuant to The New School's procedures, Dr. Reddy was promised academic freedom which included the ability to speak about issues of concern to the university community without retaliation.

6. As part of his academic work and service to The New School, Dr. Reddy had spoken and written criticizing The New School's attempts to use its financial situation to justify drastic measures including the suspension of retirement contributions and the termination of the positions of faculty members and staff. Repeatedly Dr. Reddy had performed detailed analyses of the university's finances and determined that the financial situation was not nearly as dire as the administration was portraying it, and that there were other mechanisms for addressing financial concerns including spending less money on administrative salaries. Dr. Reddy had also supported, through his financial analyses and public presentations, the unions for the part-time faculty and student workers and has supported unionization of the full-time faculty.

7. Dr. Reddy's critical statements concerning The New School were frequently quoted in news articles concerning The New School's restructuring efforts.

8. Dr. Reddy was informed by persons with direct knowledge of The New School's decision-making process concerning termination of faculty members that his termination was specifically motivated by the administration's displeasure with Dr. Reddy's writing and speech concerning the university's finances, and its desire to remove an obstacle to future finances-justified employment actions. The severance package The New School offered Dr. Reddy was conditioned on his agreement to stop criticizing the university.

9. Finally, Dr. Reddy was targeted based on his age – 55 at the time of his termination. The New School specifically targeted older faculty members for termination as evidenced by the fact that the faculty members selected for termination were, as a whole, significantly older than the faculty members who were allowed to keep their positions.

## THE PARTIES

10. Dr. Reddy is a resident of New York, New York.

11. Defendant The New School is an educational institution organized under the laws of New York with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the claims pursuant to 42 U.S.C. §1981 pursuant to 28 U.S.C. §1331.

13. This Court has supplementary jurisdiction over Plaintiff's claims under state law pursuant to 28 U.S.C. §1367.

14. This Court has personal jurisdiction over Defendant because it is organized under the laws of New York and has its principal place of business in New York.

15. Venue is properly before this Court pursuant to 28 U.S.C. § 1391 as The New School is located in this district and a substantial part of the events related to the claims occurred in this District.

## STATEMENT OF FACTS

### A. Dr. Reddy's Background.

16. Dr. Reddy received his A.B. in Applied Mathematics (with Physics) and his M.A. and Ph.D in Economics from Harvard University, along with an M.Phil. in Social Anthropology from the University of Cambridge.

17. After serving on the faculty at Barnard College, Columbia University, Dr. Reddy was recruited to join The New School and its graduate faculty division, The New School for Social Research ("NSSR"), as a tenured professor.

18. At The New School, Dr. Reddy served as Director of Undergraduate Studies (2011–2016), Co-Academic Director of the university-wide India China Institute (2012–2014), and Chair of the Department of Economics from 2022-2024 and was promoted to full professor in 2023.

19. Dr. Reddy's academic interests include the economics of higher education.

### B. Dr. Reddy Is Targeted Based on His Race and Makes Complaints of Discrimination.

20. At a dinner on April 30th, 2026, a senior, tenured, white faculty member in the economics department told the President that the only faculty members in the department who do worthwhile work were white faculty members she named, conspicuously leaving out all of the non-white faculty members. The President did not question or repudiate these remarks when they were made to him, according to the witness, who testified to Dr. Reddy about the events at the dinner.

21. This white faculty member in economics enjoys very close relations with the current university leadership and top administration. This faculty member also previously opposed the hiring of South Asian faculty members and created a hostile work environment for South Asian economics faculty members who subsequently left The New School.

22. Dr. Reddy later confronted this faculty member by stating that the South Asian economics faculty member who had left had been victimized by racism from faculty members and the administration.

23. In addition, Dr. Reddy learned from his department chair, Dr. Paulo Dos Santos, that a recent NSSR dean had referred to the economics department as looking like a "South Asian mafia" (at that time the economics department had four to five South Asian members including Dr. Reddy - now down to one, Dr. Reddy).

24. In April 2026, shortly before Dr. Reddy was notified of his termination, Dr. Reddy emailed The New School's Executive Dean, Alex Aleinikoff, confronting him about his comments on Dr. Reddy in faculty meetings, stating that the tone of Aleinikoff's criticism of Dr. Reddy involved racial biases.

**C. The New School's Policies Concerning Tenure, Academic Freedom and Freedom of Speech.**

25. The New School was originally founded in response to threats to academic freedom in the United States and abroad.

26. According to The New School's "Policy on the Free Exchange of Ideas," the institution, "since its beginnings, has endeavored to be an educational community in which public as well as scholarly issues are openly discussed and debated, regardless of how controversial or unpopular the views expressed." According to the policy, "[f]aculty members, administrators, staff members, students and guests are obligated to reflect in their actions a

respect for the right of all individuals to speak their views freely and be heard. They must refrain from any action which would cause that right to be abridged."

27. The NSSR has its own policies regarding academic freedom and its specific relation to tenure. The Charter of the Graduate Faculty New School for Social Research provides as follows:

> Tenure, academic freedom, and academic self-governance are distinguishable but tightly linked in the life of a college or university. Without freedom to explore new ideas, or to criticize existing beliefs and institutions, higher learning would become a sterile exercise and society would suffer accordingly. Academic freedom must be sustained for all Faculty without regard to rank or tenure, recognizing the fact that the use of such freedom may anger powerful vested interests in the larger society or arouse the ire of administrators, faculty colleagues, or students. Tenure is a crucial institutional means for securing the basic conditions of academic freedom for all faculty, tenured and untenured.

**D. Dr. Reddy Exercises His Academic Freedom and Freedom of Speech to Criticize The New School's Economic Justification for Austerity Measures Involving Faculty and Employees and to Support The New School's Employees.**

28. Beginning in 2020, Dr. Reddy began investigating The New School's financial situation in response to contentions from university leadership that austerity measures, including firings and suspension of retirement contributions, were necessary because of financial exigencies caused by COVID. As a result of these investigations, Dr. Reddy presented in blog entries, email communications with his colleagues and talks to the university community about university finances, his conclusions that The New School's administration and leadership had overstated the problems with the university's finances, and that any budgetary shortfalls could be resolved through means other than termination of faculty and staff, including arresting the growth of the number of administrators and reducing administrative salaries.

29. Dr. Reddy included these conclusions in academic work on the economics of higher education, which used The New School as case study in his broader research on the subject of the economics of higher education.

30. Dr. Reddy also participated in meetings with a sub-group of Trustees concerned with financial issues, the vice president for Finance and economics department faculty concerned with financial transparency. In this meeting and others, the then VP for Finance, Tokumbo Shobowale, was highly dismissive of Dr. Reddy and his arguments. Dr. Reddy publicly expressed disagreements with Shobowale as well as with the former (interim) Provost, Stephanie Browner, in meetings relating to matters of finance.

31. Dr. Reddy's involvement in questioning The New School's statements concerning its finances continued with the part-time faculty strike in late 2022. Dr. Reddy wrote further blog entries and produced slides relevant to what the university could afford in concessions to the part-time faculty. Dr. Reddy authored a publication "What Can the University Afford?" during the strike, stating that The New School could afford to make confessions to part-time faculty, to which Shobowale, on behalf of the university, posted an official written response. Dr. Reddy then published a further reply reaffirming his earlier conclusion.

32. In addition, Dr. Reddy provided support - in the form of analyses of the financial situation and talks to their leadership and their membership – at the request of the part-time faculty unions and the student worker union, and was one of a small number of full-time faculty to publicly express support for their own unionization.

33. Dr. Reddy was quoted in a majority of the articles in the New York Times concerning the topics of The New School's claimed financial exigencies and other related topics.

34. Dr. Reddy learned that senior New School officials had expressed their displeasure with his statements related to these topics. As a result of Dr. Reddy's writings and speech on these topics, Dr. Reddy's promotion to full professor was delayed.

35. In 2025, The New School again announced a university financial crisis to justify restructuring and layoff proposals.

36. As set forth below, Dr. Reddy questioned both university administrators' characterization of the financial situation and of the actions that should be taken to address these problems.

37. Thereafter, during Fall semester 2025 and Spring semester 2026, Dr. Reddy called repeatedly for a vote of no confidence in the NSSR and Lang College Deans, Provost, Vice-President for Finance and President in multiple NSSR and Lang College executive faculty meetings and in emails. These statements were based on Dr. Reddy's opposition to the premises and content of the restructuring proposals as well as the process of arriving at them, which Dr. Reddy criticized as flawed. Dr. Reddy was the most outspoken faculty member on these issues.

38. On October 29, 2025, Dr. Reddy circulated a detailed critique of the New School's narrative concerning the budgetary necessity for restructuring to the NSSR faculty, New School President Joel Towers, Provost Richard Kessler, Dean Christoph Cox and Dean Aleinikoff, which was also circulated to The New School's Board of Trustees. Dr. Reddy's critiques again questioned the necessity of terminating faculty and staff and stated that any budgetary shortfalls could be resolved in other ways, including the reduction of administrators' salaries and other administrative expenditures.

39. On December 12, 2025, Dr. Reddy sent an email to Dean Aleinikoff criticizing a memorandum sent to the faculty which appeared to provide a rationale for a reduction in the role

of the humanities and social sciences at The New School. Dr. Reddy stated that there was little or no financial justification for a reduction, contrary to the administration's claims.

40. Dean Aleinikoff responded the same evening, stating "I strongly disagree with your assessment of the charge and your attribution of motives," noting his conversations "with members of the Board of Trustees" and the President about the plan. Dr. Reddy in turn responded to this email questioning the university's projected deficit and the relevance of its proposed directions of institutional reform to the supposed financial problem.

41. On January 28, 2026, Dr. Reddy circulated an open letter ("Dear NSSR colleagues") ahead of that day's faculty meeting, contesting the administration's "structural deficit" characterization (noting that "the university has in fact run surpluses as recently as 2022 and 2023 according to its own financial statements") and urging collective resistance to the restructuring and threatened firings. Dr. Reddy sent the open letter to a New School Trustee and a member of the NSSR Board of Governors as well as to faculty colleagues and deans.

42. Dean Aleinikoff sent a negative public email in response to Dr. Reddy's open letter, stated in a subsequent faculty meeting that it was to be assumed that he and Dr. Reddy would disagree, and further referred to Dr. Reddy as irrational during an NSSR faculty meeting.

43. In or about February 2026, Dr. Reddy ran into Dean Aleinikoff entering a building on campus. Dean Aleinikoff referred to Dr. Reddy as "the person I want to strangle."

44. As stated previously, in April 2026, Dr. Reddy complained formally to Dean Aleinikoff that referring to him as irrational was racially tinged ["building on or activating various prejudices not just about me but about people like me"], especially given that Dr. Reddy's stance, contrary to that of the administration, was based on reasoned argument.

**E. Dr. Reddy Is Terminated for Discriminatory and Retaliatory Reasons.**

45. On June 1, 2026, Dr. Reddy received a formal notice of termination.

46. The notice referenced Article IX of the Full-Time Faculty Handbook, which provides:

> In the event that the board of trustees determines that it must discontinue a department/program, faculty members in that department/program or college/school will receive formal notice of not less than six months …. In cases where there is no longer an institutional need for a program, department, areas of study, or college, every effort will be made to place … tenured faculty in alternative positions elsewhere in the university.…

47. Based on the notice, Dr. Reddy had fourteen calendar days to choose between six months of remaining salary, referring to a notice period provided for in the Faculty Handbook, or resigning immediately while accepting non-disparagement and non-disclosure agreements and giving up the right to sue, in return for eleven months' salary.

48. This provision should not have applied to Dr. Reddy. Neither the economics department nor any of the programs linked to it has been closed or "discontinued," and Dr. Reddy was the sole faculty member in the department and also the only tenured faculty member with primary affiliation in any part of the New School for Social Research who received the notice.

49. As the Economics Dept. Chair, Dr. dos Santos, pointed out in a letter to Dean Aleinikoff after Dr. Reddy was notified of his termination, there was no apparent evidentiary basis for selecting the economics department for a reduction in numbers, given the lack of discontinuance of any program connected to the department, its superior enrollment performance relative to other departments and its relatively small number of faculty per student, nor was there any apparent evidential basis for terminating Dr. Reddy's employment specifically.

50. The classes Dr. Reddy taught are continuing and the economics department is scrambling to arrange coverage for these classes. Dr. Reddy has been the sole faculty member in the department to teach a core component of the Economics PhD program, the PhD course in microeconomics. In addition, Dr. Reddy provided teaching and advising in multiple other areas that are not covered by other faculty.

51. Moreover, the New School has hired part-time faculty to teach introductory economics courses elsewhere in the institution, which Dr. Reddy could easily teach. University administrators have also requested that the economics department provide additional courses due to strong demand, even after Dr. Reddy's firing.

52. There was no evident effort made to place Dr. Reddy in a different position at The New School. The administration did not consult with Dr. Reddy or his department chair, Dr. dos Santos, about what skills and experience Dr. Reddy possessed that could be utilized elsewhere in the university.

53. In fact, Dr. Reddy, who had previously taught a number of interdisciplinary classes, was well qualified to teach in other areas of The New School including ethics and political philosophy, politics and political economy (Dr. Reddy is also an affiliated member of the Politics Department, and has been since his initial appointment), development studies, global studies, international affairs, area studies, the humanities (he has previously taught a course concerning their relation to the social sciences), industrial and production management, mathematics and statistics.

54. Accordingly, if there had, in fact, been a good faith effort to find Dr. Reddy an alternative position, that effort would have likely succeeded.

55. This all makes clear that The New School used Article IX to cover up the discriminatory or retaliatory basis of Dr. Reddy's termination, which is confirmed by statements by others in The New School community.

56. In July 2026, Dr. Reddy was told by a just retired faculty member, who had previously worked in the New School Provost's office and was well-connected to the administration, that Dr. Reddy's termination was very strongly driven by "vendetta and vengeance" arising from his questioning of the official portrait of university finances. The retired faculty member made clear that The New School's administration believed that it was essential to terminate Dr. Reddy in order to silence a critic of the university's financial obfuscation.

57. Dr. Reddy also learned that a member of The New School's board of trustees had stated that Dr. Reddy's termination had been at the direction of other trustees for retaliatory reasons.

58. The economics faculty recognized the lack of evident rationale for Dr. Reddy's firing and the strong appearance of retaliation, stating publicly that "it is very difficult to resist the suggestion that Professor Reddy may have been fired for his public and longstanding criticism of the School's approach to financial management."

59. The notice also disclosed that the faculty selected for termination were significantly older than the faculty members who were retained.

**<u>FIRST CLAIM FOR RELIEF</u>**
**(Race Discrimination in Violation of 42 U.S.C. §1981)**

60. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

61. Defendant discriminated against Plaintiff in the terms and conditions of his employment on account of his race in violation of 42 U.S.C. §1981.

**SECOND CLAIM FOR RELIEF**
**(Retaliation in Violation of 42 U.S.C. §1981)**

62. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

63. Defendant retaliated against Plaintiff in the terms and conditions of his employment on account of his opposition to race discrimination in violation of 42 U.S.C. §1981.

**THIRD CLAIM FOR RELIEF**
**(Breach of Contract)**

64. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

65. The New School's "Policy on the Free Exchange of Ideas" and the Charter of the Graduate Faculty for the New School for Social Research constitute contracts between The New School and its faculty, including Dr. Reddy.

66. In each document, The New School and its faculty agreed that faculty members who speak out on matters of concern to the university community would not be retaliated against by The New School.

67. Dr. Reddy performed his duties under these agreements by speaking out about matters of concern to the university community, specifically The New School's financial justifications for restructuring and termination of faculty and staff.

68. The New School breached these agreements by retaliating against Dr. Reddy for his speech by terminating his employment.

69. Dr. Reddy will incur damages in the form of lost compensation because of The New School's breach of these agreements.

## FOURTH CLAIM FOR RELIEF
**(Promissory Estoppel)**

70. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

71. As set forth in The New School's "Policy on the Free Exchange of Ideas," and the Charter of the New School for Social Research [formerly the Charter of the Graduate Faculty], The New School promised Dr. Reddy and its other faculty members that they would not be retaliated against for speaking out on issues of concern to the university community.

72. Dr. Reddy reasonably relied on these promises by speaking out about matters of concern to the university community, specifically The New School's financial justifications for restructuring and termination of faculty and staff.

73. Dr. Reddy suffered damages as a result of his reliance on The New School's promises when he was retaliated against for his speech by having his employment terminated.

## FIFTH CLAIM FOR RELIEF
**(Age Discrimination in Violation of the New York State Human Rights Law)**

74. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

75. Defendant discriminated against Plaintiff in the terms and conditions of his employment based on his age in violation of the New York State Human Rights Law.

## SIXTH CLAIM FOR RELIEF
**(Age Discrimination in Violation of the New York City Human Rights Law)**

76. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above with the same force and effect as if fully set forth herein.

77. Defendant discriminated against Plaintiff in the terms and conditions of his employment based on his age in violation of the New York City Human Rights Law.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

A. Reinstating Plaintiff to his position and upon reinstatement, enjoining Defendant from further retaliation against him;

B. Awarding Plaintiff compensatory damages, including but not limited to economic damages and damages for emotional distress;

C. Awarding Plaintiff punitive damages;

D. Awarding reasonable attorneys' fees, costs, and expenses; and

E. Granting such other legal and equitable relief to the Plaintiff as the Court may deem just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues as of right by a jury.

Dated: September 28, 2026
New York, New York

GISKAN SOLOTAROFF & ANDERSON LLP

/s/ *Jason L. Solotaroff*
By: Jason L. Solotaroff
jsolotaroff@gslawny.com
1 Rockefeller Plaza, 8th Floor
New York, N.Y. 10020
(646) 964-9640

Attorneys for Plaintiff